**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) EIGHT ONE EIGHT, LLC, dba FASSLER HALL, an Oklahoma limited liability company,** | **Civil Action No. 25-cv-00510-CVE-SH** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **vs.** | |
| **(1) KELLIE GILMORE, an individual,** | |
| **Defendant.** | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

**January 22, 2026**

**TABLE OF CONTENTS**

Page

I.    **Introduction**................................................................................................ 1

II.    **Background** ................................................................................................ 2

    A    **Fassler Hall professionally escorted Sarah Jacobs out of its premises after she chose to physically attack a man instead of reporting her grievance to Fassler Hall security.** ........................................................................................................... 3

    B    **Ms. Gilmore is an influencer or content creator for TikTok.**............................ 6

    C    **In pursuit of making a viral TikTok post, Ms. Gilmore did little or nothing to verify the facts before Ms. Gilmore publishing her Defamatory Post.** .................... 8

    D    **Ms. Jacobs admits that Ms. Gilmore's Defamatory Post omits key material facts.**...........................................................................................................11

    E    **Fassler Hall suffered extensive damages from Ms. Gilmore's Defamatory Post. Meanwhile, Ms. Gilmore benefited as a creator or influencer for TikTok...** 12

    F    **Ms. Gilmore's Motion to Dismiss does not accurately reflect her statements in her Defamatory Post.**................................................................................... 14

III.    **Arguments and Authorities**............................................................... 15

    A    **The OCPA does not apply in federal court because it conflicts with the Federal Rules of Civil Procedure.**............................................................... 17

    B    **The OCPA does not apply in this case pursuant to Okla. Stat. tit. 12, § 1439(2).**..................................................................................................... 21

    C    **Fassler Hall satisfied the second prong of the OCPA by establishing its claims**.................................................................................................... 23

        i    **Fassler Hall has established its slander claim.** ........................................ 23

        ii    **Fassler Hall has established its tortious interference claim.** ....................... 30

**D    Ms. Gilmore fails to show that a defense—as a matter of law—applies, justifying dismissal under the third prong of the OCPA.** ......................................... 31

    **i    Ms. Gilmore failed to establish a valid defense by law for Fassler Hall's defamation claim.** ............................................................................................... 32

    **ii    Ms. Gilmore failed to establish a defense by law against Fassler Hall's tortious interference claim.** ...................................................................................... 35

**IV.    CONCLUSION** ...................................................................................... 36

# **TABLE OF AUTHORITIES**

**CASES**

Abbas v. Foreign Policy Group, LLC,
  783 F.3d 1328 (D.C. Cir. 2015)...................................................................................... 20, 21

Anagost v. Tomecek,
  390 P.3d 707 (Okla. 2017) ....................................................................................................... 15

Anson v. Erlanger Minerals and Metals, Inc.,
  702 P.2d 393 (Okla. Civ. App. 1985) ................................................................................ 24, 25

ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC,
  407 F. Supp. 3d 1186 (W.D. Okla. 2019) ................................................................................ 30

Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.,
  956 F.3d 1228 (10th Cir. 2020) ......................................................................................... 20, 21

Bentley v. Bunton,
  94 S.W.3d 561 (Tex. 2002) ...................................................................................................... 27

Bradford Sec. Processing Servs., Inc. v. Plaza Bank & Trust,
  653 P.2d 188 (Okla. 1982) ...................................................................................... 27, 34, 35

Burlington N. R. Co. v. Woods,
  480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987) ............................................................... 18, 19

Craig PC Sales & Serv., LLC v. CDW Gov't, LLC,
  No. CIV-17-003-F, 2018 WL 4861522, (W.D. Okla. Apr. 30, 2018)................................. 19, 20

Erie R. Co. v. Thompkins,
  304 U.S. 64 (1938)..................................................................................................................... 17

Fulton v. People Lease Corp.,
  241 P.3d 255 (Okla. Civ. App. 2010) ....................................................................................... 30

Gaylord Ent. Co. v. Thompson,
  958 P.2d 128 (Okla. 1998) ..................................................................... 24, 29, 30, 31, 35

Gonzalez v. Sessom,
  137 P.3d 1245 (Okla. Civ. App. 2006) .............................................................................. 24, 25

Hanna v. Plumer,
  380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) ................................................................. 18

Herbert v. Oklahoma Christian Coal,
  992 P.2d 322 (Okla. 1999) .............................................................................................. 24, 25, 32

In re Lipsky,
    460 S.W.3d 579 (Tex. 2015) ................................................................................ 16

James River Ins. Co. v. Rapid Funding, LLC,
    658 F.3d 1207 (10th Cir. 2011) .......................................................................... 18

Klocke v. Watson,
    936 F.3d 240 (5th Cir. 2019) ........................................................................ 20, 21

KLX Energy Servs., LLC v. Magnesium Mach., LLC,
    521 F. Supp. 3d 1124 (W.D. Okla. 2021) ........................................................... 22

Krimbill v. Talarico,
    417 P.3d 1240 (Okla. Civ. App. 2017) ........................ 16, 20, 21, 27, 28, 32

Lakeshore Cmty. Hosp., Inc. v. Perry,
    538 N.W.2d 24 (Mich. App. 1995) ............................................................... 30, 31

Loven v. Church Mut. Ins. Co.,
    452 P.3d 418 (Okla. 2019) ...................................................................... 30, 31, 35

Luper v. Black Dispatch Pub. Co.,
    675 P.2d 1028 (Okla. Civ. App. 1983) ......................................................... 24, 25

Magnusson v. New York Times Co.,
    98 P.3d 1070 (Okla. 2004) ................................................................................ 26

Makaeff v. Trump Univ., *LLC*,
    715 F.3d 254 (9th Cir. 2013) ............................................................................. 20

Martin v. Griffin Television, Inc.,
    549 P.2d 85 (Okla. 1976) ................................................................................... 27

McCormack v. Oklahoma Pub. Co.,
    613 P.2d 737 (Okla. 1980) ................................................................................ 34

Milkovich v. Lorain Journal Co.,
    497 U.S. 1, 110 S. Ct. 2695 (1990) .............................................................. 26, 34

Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip.,
    919 P.2d 443 (Okla. Civ. App. 1994) ................................................................. 30

Nelson v. Am. Hometown Publ'g,
    333 P.3d 962 (Okla. Civ. App. 2014) ...................................................... 23, 24, 26

New York Times Co. v. Sullivan,
    376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ......................................... 26

Racher v. Westlake Nursing Home Ltd. P'ship,
    871 F.3d 1152 (10th Cir. 2017) ................................................................. 17, 18

Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.,
    559 U.S. 393, 130 S.Ct. 1431 (2010) .................................................... 17, 18, 19

Southwest Orthopedic Specialists, PLLC v. Allison,
    439 P.3d 430 (Okla. Civ. App. 2018) ............................................ 15, 16, 17, 23

SSS Fence, LLC v. Pendleton,
    528 P.3d 304 (Okla. Civ. App. 2023) ............................................ 25, 26, 32, 33

St. Amant v. Thompson,
    390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ................................... 28

Swadley's Foggy Bottom Kitchen v. Breuklander,
    579 P.3d 730 (Okla. Civ. App. 2025) ...................................................... 21, 22

Travelers Casualty Ins. Co. of Am. v. Hirsh,
    831 F.3d 1179 (9th Cir. 2016) .................................................................... 21

Tuffy's, Inc. v. City of Oklahoma City,
    212 P.3d 1158 (Okla. 2009) ....................................................................... 30

Wilspec Techs., Inc. v. DunAn Holding Grp., Co.,
    204 P.3d 69 (Okla. 2009) .......................................................................... 30

**STATUTES**

28 U.S.C. § 2072 ............................................................................................ 18

Okla. Stat. tit. 12, § 1430 et seq. ....................................................................... 2

Okla. Stat. tit. 12, § 1430(B) ........................................................................... 15

Okla. Stat. tit. 12, § 1432 ......................................................................... 15, 17

Okla. Stat. tit. 12, § 1433 ............................................................................... 17

Okla. Stat. tit. 12, § 1434 ............................................................................... 16

Okla. Stat. tit. 12, § 1435 ............................................................................... 17

Okla. Stat. tit. 12, § 1438 ............................................................................... 17

Okla. Stat. tit. 12, § 1439(2) .................................................................. 21, 22, 23

Okla. Stat. tit. 12, § 1442 ............................................................................... 23

Okla. Stat. tit. 12, § 1443.1 ................................................................................ 23, 26

Okla. Stat. tit. 12, § 9.1 ........................................................................................ 29

## OTHER AUTHORITIES

Black's Law Dictionary, 4th Rev. Ed., 1968 ............................................................ 16

Jonathan Swift, The Examiner *No. 14* (November 9, 1710) ...................................... 1

Restatement (Second) of Torts (R.S. Torts) § 766B ................................................ 30

Restatement (Second) of Torts (R.S. Torts) §§ 766 ................................................ 30

Restatement (Second) of Torts § 564 ...................................................................... 24

## RULES

Fed. R. Civ. P. 12 ................................................................................ 17, 18, 19, 20

Fed. R. Civ. P. 12(b)(6) .................................................................................. 18, 19

Fed. R. Civ. P. 12(d) ............................................................................................ 19

Fed. R. Civ. P. 56 ................................................................................ 17, 18, 19, 20

## CONSTITUTIONAL PROVISIONS

Okla. Const. art. II, § 22 ...................................................................................... 34

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) EIGHT ONE EIGHT, LLC, dba FASSLER HALL, an Oklahoma limited liability company,** | **Civil Action No. 25-cv-00510-CVE-SH** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **vs.** | |
| **(1) KELLIE GILMORE, an individual,** | |
| **Defendant.** | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

Eight One Eight, LLC, dba Fassler Hall, an Oklahoma limited liability company ("Fassler Hall"), by and through its attorneys of record, John M. Hickey and Tyler A. Stephens of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., respectfully submits this Response to Defendant Kellie Gilmore's ( "Defendant" or "Ms. Gilmore") Motion to Dismiss [Doc. No. 29]. In support of this Response to the Motion to Dismiss, Fassler Hall states as follows:

## I.    Introduction

As the great Jonathan Swift wrote in 1710:

Falsehood flies, and truth comes limping after it, so that when men come to be undeceived, it is too late; the jest is over, and the tale hath had its effect....

Jonathan Swift, The Examiner *No. 14* (November 9, 1710).

Three centuries later, in today's digital age, Fassler Hall fell victim to the ease of spreading misinformation. Ms. Gilmore, a TikTok "influencer" or "content creator," operating her business under the screen name "Georgia Rose Curves," published a viral TikTok post on August 9, 2025, wherein she made numerous defamatory statements about Fassler Hall regarding an incident that

occurred in the early hours of August 9, 2025, for which Ms. Gilmore was not even present (the "Defamatory Post"[1]). More specifically, Ms. Gilmore portrayed a materially false story wherein Fassler Hall's security "drug" an alleged victim of sexual assault "out by her throat," and that Fassler Hall condones, promotes or simply does not care about sexual assault on its premises.

Ms. Gilmore's defamatory statements exposed Fassler Hall to public hatred, contempt, and ridicule directly harming Fassler Hall's reputation and business. Indeed, Fassler Hall's revenue plummeted for no other apparent reason in the months immediately after Ms. Gilmore's Defamatory Post. Additionally, as a direct result of the Defamatory Post, Fassler Hall's security guard received death threats by a complete stranger. Ms. Gilmore, on the other hand, who is in the business of posting controversial content for money, profited from the Defamatory Post. This is not a case involving the protection of free speech. It is a case of one person who, in the course of her business, harmed another business by making false and defamatory statements and alleged heinous or criminal conduct.

As a result of Ms. Gilmore's defamatory statements, on September 23, 2025, Fassler Hall filed its Amended Complaint [Doc. No. 8], asserting claims of slander, negligence,[2] and tortious interference with a business relationship, seeking injunctive relief and punitive damages against Ms. Gilmore. On November 20, 2025, Ms. Gilmore filed her Motion to Dismiss pursuant to the Oklahoma Citizens Participation Act, Okla. Stat. tit. 12, § 1430 et seq.

## II.    Background

The facts of this matter are well-pled in both the (Second) Amended Complaint and in

---

[1]  See Exhibit G, Defendant's Deposition at 127:10-129:21 and Exhibit 6-7 thereto.

[2]  On September 23, 2025, Fassler Hall filed its Second Amended Complaint, wherein Fassler Hall dropped its standalone negligence claim. [Doc. No. 27]

Fassler Hall's Injunction Motion, which facts are incorporated herein by reference. [Doc. Nos. 8, 10, & 27.]

    **A**       **Fassler Hall professionally escorted Sarah Jacobs out of its premises after she chose to physically attack a man instead of reporting her grievance to Fassler Hall security.**

    1.      McNellie's Group is a restaurant and hospitality group with locations spread across four cities and two states. **Brian Fontaine Affidavit, attached as Exhibit "A,"** at ¶ 3. Fassler Hall is a German inspired food and beer hall located in downtown Tulsa, Oklahoma, which opened in 2010 and is a part of the McNellie's Group. Id. at ¶¶ 3-4.

    2.      On the evening of August 8, 2025, a female customer, Sarah Jacobs ("Ms. Jacobs"),[3] an admitted frequent customer, alleged she had been sexually assaulted while at Fassler Hall. **Transcript of Sarah Jacobs Deposition, attached as Exhibit "B,"** at 17:8-12. At approximately 12:30 a.m. August 9, 2025, Ms. Jacobs reported to a bartender and the manager on duty approached the bar and informed me that a male customer "grabbed [her] ass cheek." Id. at 42:25-44:6, Exhibit 9 of Jacobs Dep. (security footage[4]); **Savannah Holz Affidavit, attached as Exhibit "C"** at ¶ 5. The manager directed Ms. Jacobs to report the incident to a security guard immediately and directed her to a security guard on the stage, within approximately twenty-two feet from where Ms. Jacobs was standing at that time. **Id**. at ¶ 6. Ms. Jacobs promptly ignored this advice and did not tell the security guard of her complaint. Id. at ¶ 7; Ex. B, Jacobs Dep. at 24:18-20.

    3.      Ms. Jacobs testified she became "overwhelmed" at that point. Ex. B, Jacobs Dep.

---

[3] Ms. Gilmore identified Sarah Jacobs as the alleged victim in her Motion to Dismiss, and Sarah Jacobs provided an affidavit in support of the Motion to Dismiss. See ECF No. 29 and 29-1.

[4] See upper portion of screen right of center, woman in a red dress pointing, starting at 22:29

at 23:11-17. Immediately after talking to the bartender/manager, she turned and attacked the man she claims touched her. Id. She claims that she saw the alleged assailant heading for Fassler Hall's exit and decided to take matters into her own hands. Id. The same security guard that had been standing close by saw the fight break out between Ms. Jacobs and another customer. **Affidavit of Christopher Little, attached as Exhibit "D"** at ¶¶ 12-14; **Layout, attached as Exhibit "H."** Without knowledge of the complaint, the security guard, doing his job, responded to the fight on the floor by notifying the other security personnel that a fight had broken out. Id.; **Affidavit of Kavi Sahjal, attached as Exhibit "E"** at ¶ 19. He and the other security personnel then moved in to break up the fight. Ms. Jacobs and the other person who Ms. Jacobs had been fighting withd were escorted out of Fassler Hall. Ex. D, Little Aff. at ¶¶ 11-17; Ex. E, Sahjal Aff. at ¶¶ 9-13, 15, 18; Ex. H, Layout; Ex. B, Jacobs Dep. at 45:3-48:20, Exhibits 10 (security footage) and 11(security footage) of Jacob's Dep.

4.      Security escorted Ms. Jacobs out first because she was on top of the man she attacked. Ex. E, Sahjal Aff. at ¶ 11. Security escorted her out in a professional and appropriate manner, but she later inaccurately claimed that security threw her out by her throat. Ex. D, Little Aff. at ¶¶ 13-14, 27; Ex. E, Sahjal Aff. at ¶¶ 12, 15, 27; Ex. F, Ashlock Aff. at ¶ 20; Ex. B, Jacobs Dep. 25:16-24, 45:3-48:20, Exhibits 10 and 11 of Jacob's Dep. Seconds later, security escorted out the other person who was involved in the fight. Ex. D, Little Aff. at ¶ 17; Ex. E, Sahjal Aff. at ¶ 18; **Affidavit of Andru Ashlock Affidavit, attached as Exhibit "F"** at ¶¶ 10-13. Ms. Jacobs and the man she was fighting with were both told they could not return that evening. Ex. D, Little Aff. at ¶ 19; Ex. E, Sahjal Aff. at ¶ 21; Ex. F, Ashlock Aff. at ¶ 16.

5.      While outside of Fassler Hall, security pointed out to Ms. Jacobs that there were Tulsa police officers right across the street sitting in a patrol car and that if she wished to make a

4

complaint with police, she should do so. Ex. E, Sahjal Aff. at ¶ 22; Ex. F, Ashlock Aff. at ¶ 15. Ms. Jacobs cursed at the security guards and left. Id. at ¶ 15; Ex. B, Jacob's Dep. at 48:21-50:5, 50:21-52:5, Exhibits 12 (security footage) and 13 (security footage) to Jacob's Dep. Later on, she said that she did not get police assistance because she "[does not] trust police." Ex. B, Jacobs Dep. at 26:20-24. Approximately eleven minutes later, the front door camera showed her attempting to re-enter the bar. Ex. F, Ashlock Aff. at ¶ 16; Ex. E, Sahjal Aff. at ¶ 21. Security did not allow Ms. Jacobs back inside that evening because she had been fighting in the bar. Id. at ¶¶ 20-23; Ex. F, Ashlock Aff. at ¶ 16.

6. That same night and into the next morning, while in an emotional and distraught frame of mind, Ms. Jacobs posted about the incident on Facebook and Instagram, alleging that "some guy reached up my skirt tonight and touched my pvssy at Fassler Hall and because I shoved his drink in his face I got kicked out and not allowed back. FVCK YOU FASSLER." Ex. B, Jacobs Dep. at 29:18-22; **Messages, ECF No. 29-2 at 5-7**. She tagged Fassler Hall in her posts, linking the business' social media accounts to her allegations. Id. In the Facebook comments, Ms. Jacobs continued, "security told me because I 'got into an altercation that I was equally at fault and not allowed back in' security threw me out by holding my throat." Id. at 5, 7. In a comment regarding the alleged assailant, she bragged about "not only knock[ing] his drink in his face I knocked him around a lil too." Ex. A, Fontaine Aff. at ¶¶ 6-7.

7. On Monday, August 11, 2025, Fassler Hall issued a public statement. In that statement it said:

> "The safety, security and well-being of our guests is always our highest priority and we take any allegation of harassment or assault in our establishment extremely seriously.
>
> On Friday evening, an incident of alleged sexual harassment by a guest was reported to a member of

our team.

We want to be clear: harassment of any kind has no place at Fassler Hall or at any of our establishments. We are currently reviewing security footage and speaking with relevant parties to ensure we have an accurate, comprehensive understanding of what occurred.

We remain steadfast in our commitment to upholding the highest standards of respect, safety, and hospitality for all those who visit us and to respond appropriately and swiftly to any and all such reports."

**Fassler Hall Statement, attached as Exhibit "I"**. The next day, another manager for Fassler Hall, Steve Venegas, reached out to Ms. Jacobs by phone to see if there was anything Fassler Hall could do to help her. **Steve Venegas Affidavit, attached as Exhibit "J"**. Fassler Hall, after being alerted to the incident, pulled some of the footage from the previous night. It was apparent from a review of one of the clips that Ms. Jacobs was not drug out of the bar by her throat. See id. at ¶ 5. He asked her if she would be willing to come in and talk to see if they could help identify the man who had assaulted her and to show her the video of being escorted out of Fassler Hall. On August 13, 2025, Mr. Venegas met with Ms. Jacobs, who, without prior notice, brought her lawyer to the meeting. See id. at ¶ 3. At this meeting Ms. Jacobs was shown the clip of her being escorted out and clearly showing that she was not thrown out as Ms. Gilmore had said in her social media post. Id. at ¶ 5. After viewing the tape Ms. Jacobs asked for compensation from Fassler Hall and in return she would post another message that effectively said that Fassler Hall was helping her. Id. at ¶ 9. He said he would have to ask his manager about her requests. Id. at ¶¶ 8, 10. But because Ms. Gilmore inserted herself into the picture, the situation turned for the worse for Fassler Hall. Ex. A, Fontaine Affidavit at ¶ 5; ECF No. 29-1 at ¶ 16.

        **B**        **Ms. Gilmore is an influencer or content creator for TikTok.**

        8.        With approximately 140,000 followers, Ms. Gilmore is a thirty-three-year-old

"mid-size creator" for TikTok operating under the handle of Georgia Rose Curves. **Defendant Kellie Gilmore Deposition, attached as Exhibit "G"** at 6:5-9, 6:19-7:15, 7:23-8:1, 8:6-15, 9:1-15. She is a "[p]lus size influencer, plus size creator who makes body positivity content and uplifts women." Id. at 8:10-12. She makes seven to ten posts per week, totaling about forty posts per month. Id. at 17:15-22. Ms. Gilmore's sole job is being a content creator for TikTok. Id. at 7:15-8:1. She later admitted that she is also a creator on OnlyFans. Id. at 191:10-14. She also portrays herself as a misandrist.[5] See Georgia Rose Curves (@georgiarosecurves), TikTok (Jan. 12, 2026), https://www.tiktok.com/t/ZP8fBF5rS/.

9.      Ms. Gilmore derives her income primarily through TikTok. Ex. G, Def. Dep. at 19:1-2. TikTok has a payout system called the "Creator Rewards Program," and the compensation through the program is "mostly based on views." Id. at 19:11-20, 20:9-13, 39:7-10. Ms. Gilmore also earns TikTok Shop commissions, along with other varied sources of income associated with being a content creator. Id. at 6:19-7:9, 7:12-14. Many of her posts include a "creator earns commission" label, which indicates that Ms. Gilmore has linked a product to the TikTok Shop, and she earns a commission every time her post originates a sale for those products. See id. at 41:3-42:10, 44:14-15. Ms. Gilmore explained that brands will reach out through the "creator space" for Ms. Gilmore's advertisement of the product. Id. at 44:10:15. When Ms. Gilmore originates a sale, Ms. Gilmore's commission varies from five to fifteen percent of the product's sales price. Id. at 45:2-7. While her primary account is @GeorgiaRoseCurves, she operates two smaller TikTok accounts because, "When you do things like TikTok [S]hop, it's beneficial to – to grow more than one account." Id. at 11:6-7.

---

[5] A "misandrist" is defined as "a person who hates men." Misandrist, Merriam-Webster, accessible at: https://www.merriam-webster.com/dictionary/misandrist (last accessed January 15, 2025).

10.    Despite being her only job, Ms. Gilmore was unable to estimate how much she earns through TikTok monthly, but it is usually more than her monthly living expenses of $600. Id. at 22:18-23, 24:2-25, 25:18-26:13.

**C    In pursuit of making a viral TikTok post, Ms. Gilmore did little or nothing to verify the facts before Ms. Gilmore publishing her Defamatory Post.**

11.    On the date of the August 9, 2025 incident, Ms. Gilmore was at her home in Turlock, California. Ex. G, Def. Dep. at 72:10-16. Ms. Gilmore learned of the alleged incident by seeing a Facebook post made by Ms. Jacobs at 1:56 a.m. PST (which would be 3:56 a.m. CST). Id. at 72:17-20, 77:24-78:9, 78:19-22, 79:9-15, 84:19-85:1.

12.    Ms. Gilmore then reached out to Ms. Jacobs on Facebook Messenger at 1:57 a.m. PST and said to Ms. Jacobs, "Bro that Fassler hall shit has me PISSED for you. Like I'm ready to take them down on social media"[6] and "That's disgusting and they should be ashamed and women should know the kind of environment they're putting themselves in if that's how they treat victims". Id. at 74:1-4, 82:20-83:3, 86:22-87:6, 87:11-88:20; Messages, ECF No. 29-2 at 8.13. Between 4:00 a.m. and 6:36 a.m. PST (6:00 a.m. and 8:36 a.m. CST), Ms. Jacobs continued to exchange Facebook messages with Ms. Gilmore discussing how her boyfriend of that evening had abandoned her. Ex. G, Def. Dep. at 91:5-14, 91:21-92:11, 92:14-22, 93:2-4; Messages, ECF. No 29-2 at 8-9.  They also write each other about the man that Ms. Jacobs assaulted.  Ms. Gilmore asked, "Did Fassler get his ID and ban him? Or did you get his name at all? Ppl are gonna ask in the video if there's a name or anything". Ex. G, Def. Dep. at 95:10-97:1; Messages, ECF. No. 29-2 at 9.  14.    Ms. Gilmore messaged Ms. Jacobs, "If it's okay with you I'm gonna make a tiktok BLASTING Fassler, telling women it's not safe to go there and not to support them." Messages, ECF. No. 29-2 at 8.

---

[6] Defendant now apparently claims that she was not trying to "take down" Fassler Hall's business. Ex. G, Def. Dep. at 137:20-138:8.

Ms. Gilmore also messaged Ms. Jacobs, "I mean to make it viral so it warns women. . . ." Id. at 9; see also Ex. G, Def. Dep. at 104:6-25. While exchanging messages, Ms. Jacobs informed Ms. Gilmore that she once had sexual intercourse with Fassler Hall's security guard, and Ms. Gilmore replied that she will keep Ms. Jacobs anonymous in the post "given that it's personal with the security guy." Ex. G, Def. Dep. at 90:3-25; 93:6-15; Messages, ECF. No. 29-2 at 8.  At the conclusion of her investigation, Ms. Gilmore sent Ms. Jacobs a copy of the Defamatory Post, and Ms. Jacobs responded, "it's perfect. I love you. I'm still in shock." Ex. G, Def. Dep. at 98:12-22; Messages, ECF No. 29-2 at 9. These were the only conversations between Ms. Gilmore and Ms. Jacobs and the extent of Ms. Jacobs's investigation before she published the Defamatory Post. Ex. G, Def. Dep. at 94:2-10.

13.    Before publishing her Defamatory Post, Ms. Gilmore never spoke with Ms. Jacobs directly (other than the social media exchanges) to verify the facts about what had happened at Fassler Hall that night.[7] Ex. G, Def. Dep. at 75:9-12, 94:2-10; Ex. B, Jacobs Dep. at 30:7-13.  Nor did she reach out to anyone at Fassler Hall. Ex. B, Jacobs Dep. at 30:7-13; Ex. G, Def. Dep. at 75:12-16, 109:18-22, 125:6-24; Messages, ECF No. 29-2 at 8-9; Ex. A, Fontaine Aff. at ¶ 18; Ex. D, Little Aff. at ¶ 30; Ex. E, Sahjal Aff. at ¶ 31; Ex. F, Ashlock Aff. at ¶ 22.

14.    Ms. Gilmore then published the Defamatory Post, which provided a materially false account of the incident and made statements such as:

   a. "**If you're a woman in Tulsa and you've ever gone to this bar downtown, you need to know that you are not safe there.  You're not safe there.  Your friends are not safe there.**"  Ex. G, Def. Dep., Exhibit 7, Transcript at 2:1-4.

   b. "Last night, one of my friends was at the bar having a great time. It's one of our favorite bars. I go there every time I go home to visit. And this man she does not fucking know

---

[7] After Jacobs had time to reflect on the Facebook post that Ms. Gilmore used as the basis for her defamatory statements, Jacobs had taken down the post from Facebook. Ex. G, Def. Dep. at 83:16-84:5.

reaches up under her skirt and touches her genitals. That is SA. That is purely SA. There is no debating it.

**And so she turns around, and throws his drink in his face and starts yelling at him. And you know what happens? They drug her out of there by her throat. By her throat. Why would you ever need to grab a woman by the throat to drag her out of that bar?**" Id. at 2:5-15.

c. "You know what security told her? They said, "Since you were involved in the altercation, you're at fault too and you're not allowed back in.

**So I just want to know, if you're a woman and you go to Fassler Hall and you get SA'd on the dance floor and stick up for yourself, you're not only going to get kicked out, security isn't going to help you, security isn't going to believe you, and they'll probably let the predator back in the bar the next night.**" Id. at 2:20-3:1.

d. "Do not let these men get away with this shit. **And do not spend money at establishments that do not care about women.**"[8] Id. at 3:5-7.

e. "She's probably gone there for five, six years now. Never -- never an altercation. Always a good time. **And then the one time a man assaults her and she sticks up for herself, y'all throw her out of the fucking bar by her throat. You ought to be ashamed of yourselves.**" Id. at 3:8-13.

f. "**And this is exactly the type of environment that Oklahoma is for women. And nobody fucking cares. The men don't believe us. Nobody fucking cares.**" Id. at 3:14-17.

"**So, if you're a woman, don't go to Fassler Hall. Just don't go to Fassler Hall, you guys. Don't spend money there, don't fucking go there. You will get assaulted, and nobody will fucking care. Welcome to Tulsa.**"[9] Id. at 3:18-22.

15. In her Defamatory Post, Ms. Gilmore accused Fassler Hall of condoning sexual assault in their place of business. Ex. G, Def. Dep. at 103:9-19, 131:23-7, 134:3-135:2. She used

---

[8] Even though Ms. Gilmore admits that the Defamatory Post is about Fassler Hall, when asked about this statement, Defendant now claims that she was not referring to Fassler Hall. Instead, her statement is, "up for interpretation." Ex. G, Def. Dep. at 139:14-24, 141:6-25.

[9] Despite making a verifiable statement that women will get assaulted if they visit Fassler Hall, Ms. Gilmore unconvincingly claimed that her assertion is merely an opinion. Ex. G, Def. Dep. at 141:13-19.

hashtags such as #Tulsa, #TulsaOklahoma, #Warning, #Oklahoma, and #Viral. Ex. G, Def. Dep. at 145:20-146:6, Exhibit 6 (video) to Def. Dep.  She used these hashtags "to reach the right audience," such as "women who might possibly go there" and "[w]omen who live in Oklahoma." Ex. G, Def. Dep. at 146:7-147:8.

16.    Ms. Gilmore was successful in creating a viral video, garnering more than 202,000 views, 17,400 likes, 1,300 comments, 1,700 bookmarks, and 7,200 shares on TikTok as of the date of this Response. See Georgia Rose Curves (@georgiarosecurves), TikTok (Aug. 9, 2025), https://www.tiktok.com/t/ZP8U7px6Y/. And, as a creator for TikTok, outraged commenters, which Ms. Gilmore interacted with and incited, identified Fassler Hall as a McNellie's Group establishment. Id.; see also Ex. A, Fontaine Aff. at ¶¶ 10, 15, 25. Commenters listed and targeted other restaurants belonging to the McNellie's Group, urging others not to visit those establishments. Id. at ¶¶ 10, 15, 25.

17.    On August 11, 2025, a local news outlet amplified Ms. Gilmore's false assertions by reporting on the incident in a broadcast, describing the events based mainly on Ms. Gilmore's Defamatory Post. Id. at ¶ 12. Later that week, the outlet reinforced its broadcast through the sharing of the Defamatory Post on its social media accounts, repeating allegations made by Ms. Gilmore. Id. at ¶ 13. In the social media video aired by the local news, it states, "the victim's friend's video went viral on TikTok." Id.  The video also included screenshot overlays of outraged commentators from Ms. Gilmore's Defamatory Post. Id. at ¶ 15.[10]

**D    Ms. Jacobs admits that Ms. Gilmore's Defamatory Post omits key material facts.**

18.    Ms. Gilmore admitted, "If – if Sarah was wrong about certain parts, then yes,

---

[10] This is the subject of a separate lawsuit against the network filed in Tulsa County District Court.

certain parts of my video would be as well." Ex. G, Def. Dep. at 169:16-18.  Ms. Gilmore also acknowledged that she was aware that Ms. Jacobs deleted her Facebook post that Ms. Gilmore relied upon when making the Defamatory Post. Id. at 83:16-84:5. Despite Ms. Jacobs's deletion of posts and even though numerous individuals have commented under Ms. Gilmore's Defamatory Post that Ms. Gilmore's statements were false and that the security guard received death threats, Ms. Gilmore has not removed the video or retracted her statements. Id. at 167:8-9.

19.     Ms. Jacobs has admitted that Ms. Gilmore's Defamatory Post omitted certain key facts such as that (1) Ms. Jacobs reported the alleged sexual assault to the bartender, (2) the bartender instructed Ms. Jacobs to report the sexual assault to security, and (3) Ms. Jacobs proceeded to confront the man and hit, or attempted to hit, the man. Ex. B, Jacobs Dep. at 23:4-24:6, 34:8-16, 44:17-45:2.  Ms. Jacobs could not recall whether or not she made contact when attempting to hit the man. Id. at 24:1-4. Ms. Jacobs also could not recall how the alleged perpetrator responded to her confrontation: "I don't know, because there was so many people around and it happened so fast." Id. at 24:9-12.  Ms. Jacobs repeatedly admitted that Fassler Hall's security footage from various angles shows Fassler Hall escorting her out by her arm rather than her neck and that she was not being dragged out by her throat. Id. at 46:18-21, 47:2-6, 48:13-20, 49:17-50:5, 51:11-18. Ms. Jacobs also admitted that, at least based on at least one angle, Ms. Gilmore's assertion that Fassler Hall drug Ms. Jacobs out by her throat is inaccurate. Id. at 48:18-20.

**E**      **Fassler Hall suffered extensive damages from Ms. Gilmore's Defamatory Post. Meanwhile, Ms. Gilmore benefited as a creator or influencer for TikTok.**

20.     The harm to Fassler Hall corporately, reputationally, and personally is significant and ongoing as Ms. Gilmore has not taken down the Defamatory Post and refuses to do so even in the face of the truth.  The harm to Fassler Hall is readily apparent based on the numerous negative comments directed toward Fassler Hall under the Defamatory Post. Ex. A, Fontaine Aff. at ¶¶ 20-

28.

21.    In addition, the damages are apparent from the drop in Fassler Hall's sales immediately after the defamatory TikTok post. Fassler Hall's sales immediately preceding the Defamatory Post were consistent and stable. Id. at ¶ 27. In the immediate month after Ms. Gilmore's Defamatory Post, from August 12, 2025, to September 8, 2025, Fassler Hall's total sales dropped $28,468.25. Id. at ¶ 22.  From September 9, 2025, to October 6, 2025, Fassler Hall's total sales were down $14,622.57 from the month immediately prior to Ms. Gilmore's Defamatory Post. Id. at ¶ 23.  The drop in total sales in the immediate two months after Ms. Gilmore's Defamatory Post a total $43,090.82. Id. at ¶ 24.  Further, Fassler Hall suffered a loss in expected profits.  Fassler Hall's loss in expected profits can be gleaned from Fassler Hall's performance for the applicable months in 2024. From September 10, 2024 to October 7, 2024, Fassler Hall's sales increased by $31,140.98.  From September 9, 2025 to October 6, 2025; however, Fassler Hall's sales increased by only $13,845.68, down $17,295.30 from the increase Fassler Hall saw in 2024.

22.    Above all, the most disturbing response to the outrage surrounding this incident was the direct and personal death threat(s) sent to the security guard falsely accused of assaulting Ms. Jacobs. Ex. E, Sahjal Aff. at ¶ 32.  The security guard was identified in the comments to Ms. Gilmore's Defamatory Post. Id.; Ex. B, Jacobs Dep. at 52:24-53:4. In other social media posts by Ms. Gilmore's followers, the security guard's photo and full name was disseminated following the outrage triggered by Ms. Gilmore's Defamatory Post. Ex. E, Sahjal Aff. at ¶ 32.  As a result of the death threats, the security guard was forced to take steps to ensure his personal safety.  Id.

23.    Ms. Gilmore's Defamatory Post was eligible for compensation through TikTok's Creator Rewards Program.  In return for the viral video, TikTok compensated Ms. Gilmore, and her follower count increased, boosting her business as an influencer. Ex. G, Def. Dep. at 13:19-

14:9, 40:2-4. Ms. Gilmore benefits when she creates a viral video: she is compensated by TikTok for the video itself, grows her follower base, and thereby increase her future potential for additional views, revenue from such increase in views, brand recognition, and commissions from TikTok Shop sales. See id.

**F        Ms. Gilmore's Motion to Dismiss does not accurately reflect her statements in her Defamatory Post.**

24.     The facts Ms. Gilmore swears to in her Motion to Dismiss are materially different from the Defamatory Post itself. Compare ECF No. 29 with Transcript (Ex. G, Def. Dep., Exhibit 7 attached thereto). She blends what she actually said in the Defamatory Post with new facts, which were not in the Defamatory Post.  Fassler Hall points out these differences because Ms. Gilmore argues that her Defamatory Post—when piecemealed rather than viewed as a whole—is substantially true.

25.     These inconsistencies call Ms. Gilmore's integrity into question. In her Motion to Dismiss, Ms. Gilmore includes the following facts that were omitted from her Defamatory Post: (1) Ms. Jacobs reported the alleged sexual assault to Fassler Hall's bar manager, (2) the bartender instructed her to report to security, (3) Ms. Jacobs ignored the direction to find security, (4) Ms. Jacobs charged down the man she accused of sexually assaulting her  and physically confronted him, (5) Ms. Jacobs hit or attempted to hit the man, (6) Fassler Hall escorted Ms. Jacobs out of the premises by her arm or wrist (and not being drug out by her throat), and (7) Ms. Jacobs left the area after being escorted out and later returned and attempted to reenter the premises. Compare ECF No. 29 at 6, 12-13, 17 and No. 29-1 at ¶¶ 5, 10 with Transcript (Ex. G, Def. Dep., Exhibit 7 attached thereto). Ms. Gilmore also contradicts herself in her Motion to Dismiss. In her Defamatory Post, Ms. Gilmore claimed that Fassler Hall is "one of our favorite bars. I go there every time I go home to visit," and that Ms. Jacobs had gone to Fassler Hall for five or six years

14

and always had a good time,[11] yet she now claims that Fassler Hall has a reputation for treating customers with disrespect[12] and hosting unruly customers. Compare Transcript (Ex. G, Def. Dep., Exhibit 7 at 2:5-7, 3:8-10) with ECF No. 29 at 12.

### III.    Arguments and Authorities

The Oklahoma Legislature enacted the OCPA, "to counteract lawsuits commonly known as SLAPP suits or strategic lawsuits against public participation which are aimed at deterring public participation in decision-making forums." Anagost v. Tomecek, 390 P.3d 707, 710 (Okla. 2017).  "The purpose of the OCPA is to encourage and safeguard the constitutional rights of persons to petition, speak freely and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Okla. Stat. tit. 12, § 1430(B).  The Act is a procedural mechanism that grants a defendant the ability to seek dismissal at an early stage of a legal action if that action is based on, relates to or is in response to a party's exercise of the right of free speech, the right to petition, or the right of association. Id. at § 1432(A).

A motion to dismiss under the OCPA triggers a three-pronged test, a set of "unusual procedures that have no precedent in Oklahoma law." Southwest Orthopedic Specialists, PLLC v. Allison, 439 P.3d 430, 434 (Okla. Civ. App. 2018).

Under the first prong, Ms. Gilmore has the burden to "show that the plaintiff's claim 'is based on, related to or is in response to the [defendant's] exercise of' (1) the right of free speech,

---

[11] Ms. Jacobs also celebrated her birthday at Fassler Hall. Ex. B, Jacobs Dep. at 20:9-10.

[12] Ms. Gilmore never had an experience where Fassler Hall treated her with disrespect. Ex. G, Def. Dep. at 114:12-16.  Her only basis for Fassler Hall's "reputation" for disrespect is based on her interpretation of how Fassler Hall treated Ms. Jacobs. Id. at 114:17-115:9.

(2) the right to petition, or (3) the right of association." Id. (quoting Okla. Stat. tit. 12, § 1434(B) [alteration in original]).

If the defendant demonstrates that the OCPA applies, the plaintiff has the burden of furnishing clear and specific evidence showing each essential element of a prima facie case for each essential element of the claim. Okla. Stat. tit. 12, § 1434(C).  Because of the contradictory standards of "clear and specific evidence" and a "prima facie case," Oklahoma courts interpret the statute to require the plaintiff to show a prima facie case. Southwest Orthopedic, 439 P.3d at 435-36; Krimbill v. Talarico, 417 P.3d 1240, 1246 (Okla. Civ. App. 2017) ("We hold that, even though the Oklahoma Act initially demands more information about a plaintiff's underlying claim by requiring a showing of a prima facie case, 'the Act does not impose an elevated evidentiary standard or categorically reject circumstantial evidence.') (quoting In re Lipsky, 460 S.W.3d 579, 591 (Tex. 2015)).  A prima facie case is defined as, "Such as will suffice until contradicted and overcome by other evidence. A case which has proceeded upon sufficient proof to that stage where it will support finding if evidence to contrary is disregarded." Krimbill, 417 P.3d at 1246 (quoting Black's Law Dictionary, 4th Rev. Ed., 1968).

If a plaintiff satisfies Section 1434(C), the burden finally shifts back to the defendant to show that a defense applies to each essential element of the claim, and, if so, the court shall dismiss plaintiff's claim. Okla. Stat. tit. 12, § 1434(D).  "If a plaintiff has established a prima facie case in the second-stage inquiry, the court may only properly consider defenses that turn solely on a question of law. It may not weigh and decide truly disputed questions of fact as 'defenses' in this third stage." Krimbill, 417 P.3d at 1249.

When determining a motion to dismiss under the OCPA, the court must consider the "pleadings and supporting and opposing affidavits stating the facts on which the liability or defense

16

is based." Okla. Stat. tit. 12, § 1435(A). The OCPA also imposes restrictions on discovery and requires the motion to dismiss to be heard on an expedited timeline, conflicting with the Federal Rules of Civil Procedure. See id. at §§ 1432(C), 1433(A), (C), 1435(B).

To underscore the unusual nature of the OCPA, Oklahoma's Court of Civil Appeals held that a dismissal under the OCPA is a decision on the merits, "treated as a final order similar to a full summary judgment or directed verdict." Southwest Orthopedic, 439 P.3d at 441. If a defendant prevails on the motion to dismiss, the court shall be awarded the defendant its reasonable attorneys' fees, and plaintiff is subject to sanctions. Okla. Stat. tit. 12, § 1438.

Clearly, the OCPA places a plaintiff in an unusual position in the early stages of a lawsuit by requiring the plaintiff to present clear and specific evidence for each essential element of the claim, staying discovery, and forcing the plaintiff to face the potential for a decision on the merits if the claim is dismissed without the constitutional right to a jury trial.

**A      The OCPA does not apply in federal court because it conflicts with the Federal Rules of Civil Procedure.**

The OCPA's three-pronged procedure conflicts with Federal Rules of Civil Procedure 12 and 56, and, therefore, should not apply in federal court. When exercising diversity jurisdiction, federal courts generally apply state substantive law and federal procedural law. See, e.g., Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1162 (10th Cir. 2017). Anti-SLAPP statutes such as the OCPA are designed to dispose of baseless defamation cases at their early onset, triggering procedural law that requires federal courts to determine whether the anti-SLAPP statutes apply under Erie R. Co. v. Thompkins, 304 U.S. 64 (1938). When a federal rule conflicts with a state's law, the Tenth Circuit applies Justice Steven's framework provided in his concurring opinion in Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393, 130

17

S.Ct. 1431 (2010). James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1217 (10th Cir. 2011).

Under Justice Stevens's test, the federal court must first determine "whether the scope of the federal rule is 'sufficiently broad' to 'control the issue' before the court, 'thereby leaving no room for operation' of seemingly conflicting state law." Shady Grove, 559 U.S. at 421, 130 S.Ct. 1431 (Stevens, J., concurring) (quoting Burlington N. R. Co. v. Woods, 480 U.S. 1, 4-5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987) (internal quotations omitted)). A conflict exists if there is a "direct collision" between the federal rule and state law. Racher, 871 F.3d 1162 (quoting Hanna v. Plumer, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)). If there is a direct collision, the court must consider whether the federal rule is valid. Id. at 422, 130 S.Ct. 1431. If the federal rule is valid, the federal rule governs the dispute. Shady Grove, 559 U.S. at 398, 130 S.Ct. 1431 (majority opinion).

Where a federal procedural rule governs the question at issue, the rule controls so long as the federal rule is a valid under the Rules Enabling Act, 28 U.S.C. § 2072. Shady Grove, 559 U.S. at 406-07, 130 S.Ct. 1431. The Rules Enabling Act requires federal procedural rules to "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2702(b); see also Shady Grove, 559 U.S. at 407, 130 S.Ct. 1431. Therefore, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies." Shady Grove, 559 U.S. at 418, 130 S.Ct. 1431. "If so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right." Racher, 871 F.3d at 1162.

The OCPA's unusual procedures conflict with Federal Rules of Civil Procedure 12 and 56. The heightened evidentiary standard imposed on a plaintiff clearly conflicts with Federal Rule 12(b)(6)'s pleading standard. As highlighted by the Western District of Oklahoma:

18

> To overcome a Rule 12(b)(6) motion, a plaintiff must only allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." "Plausible" does not mean "likely to be true." Further, unlike the OCPA standard, the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case for each element of a claim in the complaint, the elements of each claim merely help to determine whether plaintiff has set forth a plausible claim.
>
> Notably, when applying Rule 12(b)(6) in determining whether a plausible claim has been stated, the court must accept the well-pleaded facts as true. The court therefore, with limited exceptions, does not look beyond the pleadings. In contrast, the OCPA mandates that the court "consider the pleadings" as well as the "supporting and opposing affidavits" in making its determination. Upon motion and a showing of good cause, the court may also allow specific and limited discovery ... and thus, consider that evidence. Although Rule 12(d), Fed. R. Civ. P., permits the court to consider material outside of the pleadings, the court, if it does consider such material, must treat the Rule 12(b)(6) motion as one for summary judgment under Rule 56, Fed. R. Civ. P. The OCPA's procedure is not akin to a motion for summary judgment under Rule 56.

Craig PC Sales & Serv., LLC v. CDW Gov't, LLC, No. CIV-17-003-F, 2018 WL 4861522, at *13-14 (W.D. Okla. Apr. 30, 2018) (internal citations omitted).

The OCPA also conflicts with Rule 56. While Rule 56 requires a summary judgment movant "to show that there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law," the OCPA does not require the moving party to make such showing. Id. at *14.

Additionally, the OCPA's requirement that the court consider materials extraneous from the pleads conflicts with the "discretionary mode of operation [of Rule 12 and 56] and unmistakably conflicts with the mandatory provision[s]" of the OCPA. Burlington, 480 U.S. at 7, 107 S.Ct. 970 (1987).

Because the OCPA conflicts with Rule 12 and 56, this Court must determine whether the rules violate the Rules Enabling Act. Shady Grove, 559 U.S. at 422-423, 130 S.Ct. 1451-52. If

19

the federal rule abridges, enlarges or modifies a state substantive right, then the federal rule might violate the Rules Enabling Act. Craig PC, 2018 WL at *15.

In Craig PC, the Western District of Oklahoma concluded that Rules 12 and 56 abridged Oklahoma's substantive right that a prevailing Ms. Gilmore under the OCPA is entitled to reasonable attorney's fees and, therefore, held that the OCPA applies in federal court. Id. This Court, however, should conclude that the federal rules do not, in fact, violate the Rules Enabling Act. The Fifth Circuit determined that Texas's Citizens' Participation Act ("TCPA"), which Oklahoma virtually mirrored when enacting the OCPA,[13] does not apply in federal court. Klocke v. Watson, 936 F.3d 240, 242 (5th Cir. 2019). In Klocke, the Fifth Circuit found that the TCPA:

> creates no substantive rights; it merely provides a procedural mechanism for vindicating existing rights. The language of the statute is procedural. . . . The statute deals only with the conduct of the lawsuit; it creates no rights independent of existing litigation; and its only purpose is the swift termination of certain lawsuits the legislators believed to be unduly burdensome.

Id. at 247 (quoting Makaeff v. Trump Univ., *LLC*, 715 F.3d 254, 273 (9th Cir. 2013) (Kozinski, C.J., concurring) (citation omitted)). This Court should likewise conclude that the OCPA creates no substantive rights but is rather a procedural mechanism to vindicate existing rights, such as freedom of speech when such defense applies. Id.

In Abbas v. Foreign Policy Group, LLC, Judge Kavanaugh wrote the opinion for the D.C. Circuit holding that D.C.'s anti-SLAPP laws did not apply in federal court. 783 F.3d 1328 (D.C. Cir. 2015). In Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., the Northern District of Oklahoma concluded that the OCPA will not interfere with the Federal Rules of Civil Procedure, but the Tenth Circuit—without resolving the matter—stated, "We are not so sure" about

---

[13] Krimbill v. Talarico, 417 P.3d 1240 (2017) ("Oklahoma's Act . . . mirrors that of the Texas Citizens' Participation Act . . . .").

that conclusion. 956 F.3d 1228, 1237 (10th Cir. 2020).  In <u>Barnett</u>, the Tenth Circuit also indicated that now-Justice Kavanaugh's reasoning in <u>Abbas</u> was persuasive. <u>Id</u>. Even the Ninth Circuit, which currently applies California's anti-SLAPP laws in federal court, has several judges questioning the circuit's precedent:

> Our precedents have not aged with grace. Ever since we allowed them to take root, anti-SLAPP cases have spread like kudzu through the federal vineyards. . . . Fortunately, other circuits are starting to recognize this problem for what it is. . . . Now we've got a circuit split, and we are standing on the wrong side.

<u>Travelers Casualty Ins. Co. of Am. v. Hirsh</u>, 831 F.3d 1179, 1182-83 (9th Cir. 2016) (<u>Kozinski</u>, C.J., concurring).  This Court should be persuaded by the reasoning presented by the Fifth Circuit in <u>Klocke</u>, the D.C. Circuit in <u>Abbas</u>, the Tenth Circuit's indication in <u>Barnett</u> that it is persuaded by <u>Abbas</u>, along with the Ninth Circuit questioning its precedent, and, therefore, determine that the OCPA does not apply in federal court because (1) it conflicts with the Federal Rules of Civil Procedure and (2) does not abridge a substantive right of Oklahoma.

**B       The OCPA does not apply in this case pursuant to Okla. Stat. tit. 12, § 1439(2).**

Ms. Gilmore's Defamatory Post is not speech that is protected by the OCPA.  Pursuant to Okla. Stat. tit. 12, § 1439(2), the OCPA does not apply to:

> A legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct the action is based upon arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

Case law on Section 1439(2) is limited.  In <u>Krimbill</u>, 417 P.3d at 1250-51, while the Oklahoma Court of Civil Appeals looked at Texas's case law interpreting the TCPA, the court did not base its "decision on an interpretation of the OCPA's 'commercial speech' exemption," rendering the entire analysis on Section 1439(2) dicta.  Later, in <u>Swadley's Foggy Bottom Kitchen v. Breuklander</u>, Oklahoma's Court of Civil Appeals determined, with no reference of Texas's case

21

law, that the OCPA did not apply, citing in part Section 1439(2). 579 P.3d 730, 747 (Okla. Civ. App. 2025).  Most persuasively, the Western District of Oklahoma analyzed § 1439(2) in KLX Energy Servs., LLC v. Magnesium Mach., LLC, 521 F. Supp. 3d 1124 (W.D. Okla. 2021).

In KLX Energy, the court took a textual approach in analyzing Section 1439(2). Id. at 1132-34.  The court tracked the text of the statute:

- "[a] legal action"
- is "brought against a person primarily engaged in the business of selling or leasing goods or services"
- "if the statement or conduct the action is based upon"
- "arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction"; and
- "in which the intended audience is an actual or potential buyer or customer."

Id. at 1133.

Clearly, the OCPA does not apply to the case at hand pursuant to Okla. Stat. tit. 12, § 1439(2).  Here, Fassler Hall filed its action against Ms. Gilmore, who is primarily engaged in the business of providing services: e.g. creating videos for TikTok, and selling goods on the TikTok Shop. See Okla. Stat. tit. 12, § 1439(2); See supra Background ¶¶ 8-9.  Ms. Gilmore posted the Defamatory Post on TikTok, so the conduct at issue in this lawsuit arose out of the services she renders for TikTok and her sale of goods on the TikTok Shop. Id. at ¶¶ 8-9, 12, 14, 16.  Finally, her intended audience on TikTok is women, included those in Tulsa, Oklahoma, and she clearly targets that audience in her Defamatory Post. Id.; Transcript (Ex. G, Def. Dep., Exhibit 7 at 2:1-4, 3:4-5, 3:18-19).  To erase any doubt as to Section 1439(2)'s applicability, TikTok compensated Ms. Gilmore for the Defamatory Post. See supra Background ¶ 23. Therefore, the OCPA does not apply in this matter pursuant to Okla. Stat. tit. 12, § 1439(2), and Ms. Gilmore's Motion to Dismiss should be denied.

**C**          **Fassler Hall satisfied the second prong of the OCPA by establishing its claims.**

Fassler Hall's Second Amended Complaint and its Injunction Motion meet Fassler Hall's burden of establishing a prima facie case for its slander and tortious interference claims. Nonetheless, Fassler Hall has reestablished its claims through this Response and the affidavits attached hereto.[14]

**i**          **Fassler Hall has established its slander claim.**

Fassler Hall's position that Ms. Gilmore's Defamatory Post is slanderous is well-founded. Under Oklahoma law, slander is the false and unprivileged publication that charges a person with a crime, tends to directly injure a person in respect to his business by imputing something that has a natural tendency to lessen its profit, or, which by natural consequences, causes actual damage. Okla. Stat. tit. 12, §§ 1442(1), (2), and (5).  Under Okla. Stat. tit. 12, § 1443.1, a "privileged communication" is one made in any legislative, judicial, or other proceeding authorized by law.

In order to recover for defamation, a private figure must prove "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage [per se], or the existence of special damage caused by the publication [per quod]." Nelson v. Am. Hometown Publ'g, 333 P.3d 962, 969 (Okla. Civ. App. 2014) (alterations in original) (citation omitted).  "A communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third

---

[14] If the Court determines that the OCPA applies in federal court and § 1439(2) does not apply, Fassler Hall concedes that Ms. Gilmore met her burden under the first prong of the OCPA. Southwest Orthopedic Specialists, P.L.L.C. v. Allison, 439 P.3d 430, 435 (Okla. Civ. App. 2018) ("The first-stage inquiry is simply whether the defendant can make a plausible showing that the plaintiff's lawsuit was driven, at least in part, by one of the forms of speech enumerated in § 1431.").

persons from associating or dealing with him." Herbert v. Oklahoma Christian Coal, 992 P.2d 322, 327 n.4 (Okla. 1999). The defamatory statement must concern the plaintiff, either by the defendant intentionally referring to the plaintiff or where the recipient mistakenly but reasonably understands that the defendant's statement refers to the plaintiff. Gonzalez v. Sessom, 137 P.3d 1245, 1248 (Okla. Civ. App. 2006). "It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended." Nelson, 333 P.3d at 970 (quoting Restatement (Second) of Torts § 564).

A defamatory statement "is actionable per se when the language used is susceptible of but a single meaning that is opprobrious. In contrast, [a defamatory statement] is . . . [actionable] per quod if the words are reasonably susceptible of both a defamatory and an innocent meaning." Gaylord Ent. Co. v. Thompson, 958 P.2d 128, 147 (Okla. 1998). Further, a defamatory statement is per se actionable when the defendant charges the plaintiff with criminal acts. Luper v. Black Dispatch Pub. Co., 675 P.2d 1028, 1031 (Okla. Civ. App. 1983); see Anson v. Erlanger Minerals and Metals, Inc., 702 P.2d 393, 397-98 (Okla. Civ. App. 1985) (noting that statements may imply criminal acts, conveying a defamatory meaning).

### 1. Ms. Gilmore's Defamatory Post is a false and defamatory against Fassler Hall.

Here, Ms. Gilmore's Defamatory Post is per se defamatory. First, her Defamatory Post is materially false and opprobrious. See Gaylord, 958 P.2d at 147. Ms. Gilmore falsely asserted four times that Fassler Hall dragged Ms. Jacobs out of its premises "by her throat." Transcript (Ex. G, Def. Dep., Exhibit 7 at 2:13-15, 3:11-12); supra Background ¶ 4. Ms. Gilmore's assertions are not susceptible to an innocent meaning. Her Defamatory Post is also per se defamatory because she charged Fassler Hall with criminal acts or conduct of moral turpitude, alleging that Fassler Hall

permits, condones, or does not care about sexual assault on its premises. See Transcript (Ex. G, Def. Dep., Exhibit 7); Luper, 675 P.2d at 1031; Anson, 702 P.2d at 397-98.

In addition to the falsity of the allegations of Fassler Hall condoning acts of moral turpitude, Ms. Gilmore omitted key facts that render the story materially false. See supra Background ¶¶ 4, 18-19. Ms. Gilmore's story in the Defamatory Post cannot reasonably be considered substantially true when considering the false portrayal and omitted facts. See SSS Fence, LLC v. Pendleton, 528 P.3d 304, 308-10 (Okla. Civ. App. 2023). Whereas the Defamatory Post is framed in a way to incite outrage directed at Fassler Hall, a reasonable listener's reaction after hearing the actual facts would not result in such outrage. See Herbert, 992 P.2d at 327 n.4. The Defamatory Post, which Ms. Gilmore refuses to take down, portrays a materially false story that has reached over 202,000 viewers so far.

Ms. Gilmore also made numerous false assertions that Fassler Hall is not safe for women or that Fassler Hall will do nothing to protect women who have been sexually assaulted in its facilities. See Transcript (Ex. G, Def. Dep., Exhibit 7 at 2:1-4, 3:5-7, 3:14-22). Each statement is patently false and defamatory. Ms. Gilmore's assertion that Fassler Hall does not care about women or permits sexual assault on its premises lowers Fassler Hall "in the estimation of the community or to deter[s] third persons from associating or dealing with [Fassler Hall]." Herbert, 992 P.2d 322, 327 n.4 (Okla. 1999).

Ms. Gilmore might claim that not all of her statements were directed at Fassler Hall, yet it is clear that the Defamatory Post is about Fassler Hall: she opens by saying that women are not safe at Fassler Hall's establishment and closes by telling women not to go to Fassler Hall's establishment. See Transcript (Ex. G, Def. Dep., Exhibit 7 at 2:1-4, 3:18-22). The Defamatory Post has a photo of Fassler Hall in the background! A reasonable viewer would conclude that Ms.

25

Gilmore directs the entire Defamatory Post toward Fassler Hall. <u>Gonzalez</u>, 137 P.3d at 1248; <u>Nelson</u>, 333 P.3d at 970. Fassler Hall can establish that Ms. Gilmore's Defamatory Post is false and defamatory.

2. <u>Ms. Gilmore's Defamatory Post is not privileged.</u>

Ms. Gilmore's Defamatory Post is not privileged speech. Ms. Gilmore's statements in the Defamatory Post were false factual assertions—not opinions—and, therefore, are not privileged and do not qualify for constitutional protection. <u>Magnusson v. New York Times Co.</u>, 98 P.3d 1070, 1076 (Okla. 2004). In addition, Ms. Gilmore's statements are not privileged because they were not made in any legislative, judicial, or other proceeding authorized by law. <u>See</u> Okla. Stat. tit. 12, § 1443.1. Finally, even if Ms. Gilmore's statements are opinions, they are not protected because they are based on facts that are incorrect or incomplete, or her assessment of the facts is erroneous, implying a false assertion of fact. <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 18-19, 110 S. Ct. 2695, 2705-2706 (1990); <u>SSS Fence, LLC v. Pendleton</u>, 528 P.3d 304, 308-10 (Okla. Civ. App. 2023).

3. <u>Ms. Gilmore was negligent or, alternatively, had actual malice when posting the Defamatory Post.</u>

Ms. Gilmore's fault amounts to at least negligence, and, if necessary, meets the standard of actual malice.[15] The elements of a negligence are: (1) a duty of care owed by defendant to plaintiff; (2) defendant's breach of that duty; (3) injury to plaintiff caused by defendant's breach of that duty.

---

[15] If a defamation plaintiff is a public figure, the plaintiff must show actual malice rather than negligence. <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In her Motion to Dismiss, Ms. Gilmore does not dispute Fassler Hall's contention that it is a private figure. ECF No. 29 at 22 ("Presently, Fassler claims it is not a public figure, therefore, the actual malice requirement is not applicable.") Ms. Gilmore should be barred from later asserting that Fassler Hall is a public figure.

26

A defendant owes a duty to anyone that might foreseeably be injured by the defendant's conduct. A duty exists when "the conduct of an ordinarily prudent man based upon the dangers he should reasonably foresee to the plaintiff . . . [brings] the plaintiff within the orbit of defendant's liability." Bradford Sec. Processing Servs., Inc. v. Plaza Bank & Trust, 653 P.2d 188, 191 (Okla. 1982).

Here, Ms. Gilmore owed Fassler Hall a duty of care because her Defamatory Post was directly about Fassler Hall. Ms. Gilmore owed Fassler Hall a duty of care not to make defamatory statements directed at Fassler Hall. As indicated at length herein, Ms. Gilmore breached this duty by posting the Defamatory Post. And while Ms. Gilmore argues that she exercised her duty of care, Ms. Gilmore did not even call Ms. Jacobs to obtain a full, complete rundown of the events that occurred, nor did she contact anyone at Fassler Hall. See supra Background ¶¶ 12-13. Ms. Gilmore did not reach out to Fassler Hall or any other person that was present before relying on Ms. Jacobs's emotionally biased account. Id. Ms. Gilmore's Defamatory Post, which reached over 200,000 viewers, lowered Fassler Hall's reputation, caused a significant drop in sales immediately after the Defamatory Post's virality, and endangered individuals at Fassler Hall, as evidenced by the death threat(s) Fassler Hall's security guard received after the Defamatory Post. See supra Background ¶¶ 16, 20-22. Fassler Hall met its burden of establishing a prima facie case for the negligence element.

In the event Fassler Hall must establish actual malice instead of negligence, Fassler Hall meets its burden. "[T]he actual malice standard requires proof that a defendant acted with knowledge that a publication was false 'or with reckless disregard of whether it was false or not.'" Krimbill v. Talarico, 417 P.3d 1240, 1253 (2017) (quoting Martin v. Griffin Television, Inc., 549 P.2d 85 (Okla. 1976)). "[T]he Supreme Court stressed that proof of actual malice cannot be defeated with simply the defendant's self-serving protestations of sincerity. . . ." Bentley v. Bunton,

27

94 S.W.3d 561, 596 (Tex. 2002) (citing St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).  In Krimbill, the Oklahoma Court of Civil appeals held that a plaintiff can establish a prima facie case for actual malice by circumstantial evidence. 417 P.3d at 1253-54.

By conferring only with Ms. Jacobs—and only through Facebook Messenger—before making heinous allegations against Fassler Hall, Ms. Gilmore acted with a reckless disregard of whether her Defamatory Post was false. See supra Background ¶¶ 12-13.  Ms. Jacobs's social media post was clearly biased against Fassler Hall, and there was ample reason for Ms. Gilmore to question Ms. Jacobs's portrayal of the incident.  For example, while Ms. Jacobs informed Ms. Gilmore that she slept with the security guard who escorted her out. Ms. Gilmore ignored this potential bias, opting instead to keep Ms. Jacobs anonymous "given that it's personal with the security guy." See supra Background ¶ 12.  And as a misandrist, Defendant's response conveys a more ominous motivation in making the Defamatory Post: she was willing to overlook Ms. Jacobs's bias to harm the man's reputation. See id. at ¶¶ 6, 8, 14.

Ms. Gilmore's actual malice can also be inferred based on her admitted positive experiences at Fassler Hall.  Ms. Gilmore states in her Defamatory Post that Fassler Hall is "one of our favorite bars. I go there every time I go home to visit." Transcript (Ex. G, Def Depo., Ex. 7 at 2:5-7.  Despite being one of her favorite bars, she did not question Ms. Jacobs's account, and instead recklessly relied on Ms. Jacobs's biased account when posting the Defamatory Post. See supra Background ¶¶ 11-15.

Ms. Gilmore overlooked Ms. Jacobs's bias and potential inaccuracies because Ms. Gilmore saw the opportunity to capitalize on making a viral TikTok post.  Her messages to Ms. Jacob show a clear intention to publish a viral TikTok video. See Messages, ECF No. 29-2 at 8; supra Background ¶¶ 12-14.  To ensure virality, Ms. Gilmore included hashtags such as #Tulsa,

28

#TulsaOklahoma, #Warning, #Oklahoma, and #Viral. <u>Supra Background</u> ¶ 15. Ms. Gilmore subsequently benefited from gaining followers, and TikTok compensated her for the post. <u>Id</u>. at ¶ 23.

Ms. Gilmore acted with a reckless disregard of the truth so that she could make a viral TikTok video and grow her brand as an influencer. While Fassler Hall is not a public figure, Fassler Hall has met its burden of establishing a prima facie case for the element of actual malice.[16]

    4. <u>Ms. Gilmore per se damaged Fassler Hall, and Fassler Hall can establish damages.</u>

Fassler Hall has established that the Defamatory Post is actionable per se and suffered actual damages. <u>See Gaylord Ent. Co. v. Thompson</u>, 958 P.2d 128, 147 (Okla. 1998). Ms. Gilmore's repeated assertion that Fassler Hall "drug" Ms. Jacobs out of the premises "by her throat" "is susceptible of but a single meaning that is opprobrious." <u>Id.</u>; <u>Transcript</u> (Ex. G, Def. Dep., Exhibit 7 at 2:13-15, 3:10-12). Ms. Gilmore's assertions are not susceptible to an innocent meaning. The opprobrious meaning is evidenced by the post's virality, the outraged commenters, the local news report, the death threat(s) the security guard received, and the sudden and steep drop in sales Fassler Hall suffered as a result of the Defamatory Post. <u>See supra Background</u> ¶¶ 16-19, 20-22. The quantifiable drop in sales also establishes Fassler Hall's actual damages. <u>Id.</u> at ¶ 21.

Because Fassler Hall established a prima facie case for each element of its slander claim, the burden shifts to Ms. Gilmore to show that a dismissal is warranted under the third prong of the OCPA.

---

[16] For the purposes of punitive damages, Fassler Hall incorporates its analysis provided herein. <u>See</u> Okla. Stat. tit. 12, §§ 9.1(B) and (C).

**ii        Fassler Hall has established its tortious interference claim.**

"Oklahoma jurisprudence teaches that one has the right to prosecute a lawful business without unlawful molestation or unjustified interference from any person, and any malicious interference with that business is an unlawful act and an actionable wrong." Gaylord, 958 P.2d at 149 fn. 96.  Oklahoma has long embraced tortious interference claims found in Restatement (Second) of Torts (R.S. Torts) §§ 766 and 766B. Fulton v. People Lease Corp., 241 P.3d 255, 263 (Okla. Civ. App. 2010).

The elements for tortious interference with a contractual or business relationship are "(1) interference with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage." Wilspec Techs., Inc. v. DunAn Holding Grp., Co., 204 P.3d 69, 74 (Okla. 2009).  Malice is "an unreasonable and wrongful act done intentionally, without just cause or excuse." Tuffy's, Inc. v. City of Oklahoma City, 212 P.3d 1158, 1165 (Okla. 2009). "Tortious interference with business relations may be caused by defamatory statements." Lakeshore Cmty. Hosp., Inc. v. Perry, 538 N.W.2d 24, 27 (Mich. App. 1995) (cited in ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC, 407 F. Supp. 3d 1186, 1195 (W.D. Okla. 2019)).  A defendant must direct her interference "at the business relationship between [plaintiff] and some other party." Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip., 919 P.2d 443, 447 (Okla. Civ. App. 1994).

In the context of tortious interference of a prospective economic advantage, the elements are (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectance on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted. Loven v. Church Mut. Ins. Co., 452 P.3d 418, 425 (Okla.

30

2019).  "[L]ike the tort of current or present business interference[,] . . . the element of intentional interference clearly requires a showing of bad faith.  The interference must be the purpose of the tortfeasor's act, and their motive must include a desire to interfere and disrupt the others' prospective economic business advantage."  Id. at 425-26.

Fassler Hall meets its burden for both types of tortious interference claims.  Fassler Hall is a food and beer hall that has been serving the Tulsa community since August of 2010.  Supra Background ¶ 1.  Ms. Gilmore knew that Fassler Hall is an established food and beer hall.  Transcript, Ex. 7 at 2:5-6, 3:8-10.  Fassler Hall held a continued right to serve its established customer base and prospective customers.  See Gaylord, 958 P.2d 128, 149 fn. 96.  As discussed at length herein, Ms. Gilmore acted with malice toward Fassler Hall when posting the Defamatory Post.  Ms. Gilmore explicitly urged women, both as established customers and potential customers of Fassler Hall, not to patronize Fassler Hall's establishment.  See Transcript (Ex. G, Def. Dep., Exhibit 7 at 2:1-4, 3:18-20).  Ms. Gilmore's interference is rooted in defamation, which is wrongful, not justified, privileged nor excusable.  See Lakeshore, 538 N.W.2d at 27 (noting that tortious interference may be caused by defamatory statements).  Ms. Gilmore even admitted that one of her goals was to keep people away from Fassler Hall.  Messages, ECF No. 29-2 8-8; supra Background ¶¶ 12-14.  As evidenced by the outraged commentators, where many said that they will never return or attend Fassler Hall's establishment, along with the sudden plummet in sales in the immediate months thereafter, Ms. Gilmore's Defamatory Post proximately damaged Fassler Hall.  Supra Background ¶¶ 16-19, 20-22.

Fassler Hall has clearly met its burden for both types of tortious interference claims.

**D      Ms. Gilmore fails to show that a defense—as a matter of law—applies, justifying dismissal under the third prong of the OCPA.**

As discussed above, under the third prong of the OCPA, "the court may only properly

31

consider defenses that turn solely on a question of law. It may not weigh and decide truly disputed questions of fact as 'defenses' in this third stage." <u>Krimbill</u>, 417 P.3d at 1249. Therefore, Ms. Gilmore must show as a matter of law, rather than fact, that a defense applies and that the OCPA should be dismissed.

### i        Ms. Gilmore failed to establish a valid defense by law for Fassler Hall's defamation claim.

In her Motion to Dismiss, while not entirely clear, it appears that the Ms. Gilmore raised only two defenses regarding Fassler Hall's slander claim: truth and opinion. ECF No. 29 at 11, 15. Neither defense is viable nor justifies a dismissal at such an early stage in this matter. To determine truth or opinion, the Court would have to wade into the waters of weighing evidence, which is not permitted at this stage. <u>Krimbill</u>, 417 P.3d at 1249. Nonetheless, Fassler Hall will address Ms. Gilmore's arguments below.

### 1.   Ms. Gilmore's Defamatory Post was not substantially true.

As discussed at extensive length above, Ms. Gilmore's Defamatory Post is materially false. <u>See supra Background</u> ¶¶ 2-6, 13-15, 18, 19, 24, 25. Ms. Gilmore omitted numerous material facts regarding the August 9, 2025 incident. <u>See</u> <u>id</u>. at ¶¶ 21, 26-27; <u>Compare</u> ECF No. 29 with <u>Transcript</u> (Ex. G, Def. Dep., Exhibit 7).

The facts that were omitted from Ms. Gilmore's Defamatory Post render Ms. Gilmore's account of the event materially false. Ms. Gilmore portrayed Fassler Hall as a bad actor, inciting public outrage and harm against Fassler Hall. <u>Herbert</u>, 992 P.2d at 327 n.4. Had Ms. Gilmore included the omitted facts, viewers would not have been misled and outraged at Fassler Hall's professional conduct. <u>See SSS Fence</u>, 528 P.3d at 308-10. Therefore, Ms. Gilmore failed to establish that her Defamatory Post, as a matter of law, was true.

Other than her materially false account of the August 9, 2025 incident, Ms. Gilmore made other actionable false statements of fact in her Defamatory Post, particularly when it comes to Fassler Hall's treatment of women.  Ms. Gilmore made verifiable statements such as that women "are not safe there," Fassler Hall does "not care about women," "nobody fucking cares," and "You will get assaulted and nobody will fucking care." Transcript (Ex. G, Def. Dep., Exhibit 7 at 2:3-4, 3:6-7; 3:20-22) (emphasis added).  Each of these statements are easily verifiable and false. See SSS Fence, 528 P.3d at 308 (noting that a company's treatment toward its customers can be proven as true or false).  For example, Ms. Gilmore asserted that if a female goes to Fassler Hall's establishment, she **will** get assaulted and nobody will care.  Ms. Gilmore's statement can be easily tested: by attending Fassler Hall's establishment, will a woman be assaulted?  The simple answer is an emphatic no, otherwise Fassler Hall would have been shut down long ago for discriminatory and criminal behavior.  In short, Ms. Gilmore falsely asserted that Fassler Hall does not care about women and that each woman that visits Fassler Hall's establishment will be assaulted.

   2. Ms. Gilmore did not make statements of opinion. If she did make statements of opinion, they implied a false assertion of fact.

In her Motion to Dismiss, Ms. Gilmore argues that Fassler Hall's claims are not actionable because Ms. Gilmore made statements of opinion rather than fact. ECF No. 29 at 19-16.  A simple review of the Defamatory Post shows that Ms. Gilmore made statements of fact rather than opinion. See Transcript (Ex. G, Def. Dep., Exhibit 7). Yet, even if they were statements of opinion:

> If a speaker says, 'In my opinion John Jones is a liar,' he implies knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinions does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' As Judge Friendly aptly stated: '[It] would be destructive of the law of libel if a writer could

33

escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words "I think."'

Milkovich, 497 U.S. at 18-19, 110 S.Ct. 2695.  While the Oklahoma Constitution states that "[e]very person is free to speak, write, or publish his sentiments on all subject," individuals are also "responsible for the abuse of that right . . . ." Okla. Const. art. II, § 22.  Oklahoma's Supreme Court emphatically stated, "Recovery should be allowed for the abuse of such freedom. [Defamation] is one such abuse." McCormack v. Oklahoma Pub. Co., 613 P.2d 737, 741 (Okla. 1980) (in the context of freedom of press).

Here, Ms. Gilmore cannot crouch behind the "opinion" defense.  Even if any statements were opinions, considering all of the material facts that were omitted from the Defamatory Post, Ms. Gilmore's statements were based upon facts that were either incorrect or incomplete, or her assessment of them is erroneous, thereby implying a false assertion of fact. See Milkovich, 497 U.S. at 18-19, 110 S.Ct. 2695.  Even assuming that Ms. Gilmore did not know about the material facts omitted from the Defamatory Post, she is not relieved from liability pursuant to Milkovich. See id.

Ms. Gilmore failed to establish that her statements are protected as opinions as a matter of law.

3.    Ms. Gilmore did not satisfy her duty of care owed to Fassler Hall.

Ms. Gilmore claims that Fassler Hall cannot establish its slander claim due to the negligence element. See ECF No. 29 at 21.  She claims that she was not negligent because she sent the draft Defamatory Post to Ms. Jacobs for her review and approval. Id.  However, Ms. Gilmore confuses her duty of care toward Ms. Jacobs as being satisfactory for her duty of care toward Fassler Hall.  Ms. Gilmore owed a duty of care to Fassler Hall, not Ms. Jacobs, in avoiding false statements about Fassler Hall. Bradford Sec. Processing Servs., Inc. v. Plaza Bank & Trust, 653

P.2d 188, 191 (Okla. 1982).  Ms. Gilmore did not satisfy this duty when she relied solely on Ms. Jacobs's statements and approval, who provided a one-sided story and clear bias against Fassler Hall, rather than consulting Fassler Hall, or any witnesses for that matter, regarding the accuracy of the Defamatory Post. See supra Background ¶ 13.  Therefore, Ms. Gilmore failed to establish that the she was not negligent in posting the Defamatory Post.

**ii**        **Ms. Gilmore failed to establish a defense by law against Fassler Hall's tortious interference claim.**

In her Motion to Dismiss, Ms. Gilmore does not appear to raise a defense as a matter of law regarding Fassler Hall's tortious interference claim(s).  Instead, without any citing any authority, Ms. Gilmore argued that Fassler Hall cannot establish tortious interference because bars "naturally operate with constantly shifting, unpredictable customers" which does not create "any protectable business or contractual right." ECF No. 29 at 23.  Without any cited authority, Ms. Gilmore's argument should fail.

Further, Fassler Hall has been serving the Tulsa community since 2010. See supra Background ¶ 1. Fassler Hall's total sales prior to the Defamatory Post were consistent and stable. Id. at ¶ 21.  Fassler Hall had an established customer base and right to prosecute such lawful business without unlawful molestation or unjustified interference from Ms. Gilmore. Gaylord Ent. Co. v. Thompson, 958 P.2d 128, 147 (Okla. 1998).  In addition, Oklahoma jurisprudence recognizes claims for tortious interference of prospective economic advantage, such as potential customers. See Loven v. Church Mut. Ins. Co., 452 P.3d 418, 425 (Okla. 2019).  Fassler Hall did, in fact, have a right, and Ms. Gilmore unlawfully interfered with that right by publishing her Defamatory Post.  Therefore, Ms. Gilmore does not have a defense as a matter of law that she will prevail on the tortious interference claim(s).

35

## IV.    CONCLUSION

For the reasons set forth herein, Eight One Eight, LLC, dba Fassler Hall, an Oklahoma limited liability company respectfully requests that the Court deny Kellie Gilmore's Motion to Dismiss [Doc. No. 29] in its entirety.

Respectfully submitted,

**HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C**

s/*John M. Hickey*

John M. Hickey, OBA #11100
Tyler A. Stephens, OBA #35241
521 East 2nd Street, Suite 1200
Tulsa, Oklahoma  74120-1855
Telephone:    (918) 594-0400
Facsimile:    (918) 594-0505
Email: jhickey@hallestill.com
Email: tstephens@hallestill.com

36

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2026, I electronically transmitted the attached document, to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the Following ECF Registrants:

Barry G. Reynolds
J Schaad Titus
Ashley F. Vinson
Taylor Pepperworth
Titus Hillis Reynolds Love
15 East Fifth Street, Suite 3700
Tulsa, OK 74103
(918) 587-6800
(918) 587-6822 (Fax)
reynolds@titushillis.com
stitus@titushillis.com
avinson@titushillis.com
tpepperworth@titushillis.com
*Attorneys for Ms. Gilmore*

s/*John M. Hickey*

21543446.1:320449.02321

37